[No. 53941–3.   En Banc.   November 30, 1989.]

ELAINE MCKEE, *Appellant,* v. AMERICAN HOME PRODUCTS CORPORATION, ET AL, *Respondents.*

*Stephen J. Dwyer* and *Richard F. McDermott, Jr.* (of *McDermott & Jones, P.S.*) and *Robert J. Conklin,* for appellant.

*Carney, Stephenson, Badley, Smith, Mueller & Spellman, P.S., Palmer Robinson,* and *James E. Horne,* for respondent Sidran.

*John Patrick Cook, Timothy A. Reid, David L. Martin,* and *Lee, Smart, Cook, Martin & Patterson, P.S.,* for respondent Mezistrano.

*Gary N. Bloom* and *Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association, amici curiae for appellant.

*Ronald S. Dinning* and *Bruce G. Lamb* on behalf of Washington Defense Trial Lawyers; *Joseph D. Puckett, Stephan J. Francks,* and *Paul R. Cressman* on behalf of Washington State Pharmacists' Association, amici curiae for respondents.

CALLOW, C.J.—The plaintiff, Elaine McKee, appeals a summary judgment dismissing her cause of action against defendant pharmacists Gerald Sidran and Leonard Mezistrano. The trial court ruled that the pharmacists, who had filled McKee's drug prescriptions for 10 years, had no duty to warn her of the adverse side effects of long–term administration of that drug. We affirm.

From 1974 through 1984 McKee received prescriptions for Plegine, an appetite suppressant, from her family physician to control an ostensible weight problem. Plegine is an amphetamine and is potentially addictive. It is a class III drug, requiring either an oral or written prescription from a physician each time it is filled. WAC 360–36–010, –020. The manufacturer's information contained in the *Physicians' Desk Reference* (1984) (PDR) states, among other things, that Plegine "is indicated in the management of exogenous obesity as a short–term adjunct (a few weeks) . . ." It further warns:

Amphetamines and related stimulant drugs have been extensively abused, and the possibility of abuse of Plegine should be kept in mind when evaluating the desirability of including a drug as part of a weight reduction program. . . .

Tolerance to the anorectic effect of Plegine . . . develops within a few weeks. When this occurs, its use should be discontinued . . .

The desk reference for *physicians* also lists various side effects from overuse, such as: extreme fatigue and mental depression after abrupt cessation, intense psychological dependence and severe social dysfunction, and at an extreme, psychosis.[1]

---

[1] The *Physicians' Desk Reference* is supplied by drug manufacturers for the guidance of physicians, not pharmacists.

McKee filled nearly all her Plegine prescriptions at a pharmacy in Seward Park in Seattle. From 1974 through 1981, the prescriptions were filled by Sidran, who owned the pharmacy. In April 1981, Sidran sold the pharmacy to Mezistrano, who continued to fill McKee's prescriptions until they were discontinued by a second physician in 1984. It is undisputed that the pharmacists filled the prescriptions accurately and pursuant to either a written prescription or oral refill authorization from McKee's physician.

McKee's prescriptions were for 100 tablets each. The manufacturer packaged Plegine in 100–tablet bottles; attached to the outside of each was the manufacturer's package insert. Before giving McKee a bottle of Plegine, the pharmacists would remove the package insert and place their own label on the bottle to comply with state and federal labeling laws.[2] It is undisputed that at no time did either pharmacist warn McKee of the possible side effects of extended use of Plegine or give her the manufacturer's insert.

In 1985, McKee brought this action against the prescribing physician, the drug manufacturer, and the defendant pharmacists, seeking damages for physical and psychological injuries allegedly sustained as a result of her addiction to Plegine. Only the claims against the pharmacists are at issue in this appeal.

McKee alleged the pharmacists were negligent in selling her Plegine for such an extended length of time without warning her of its adverse effects and were negligent in failing to give her the manufacturer's package insert. She also alleged strict liability and breach of express and implied warranties. The pharmacists moved for summary

---

[2]RCW 18.64.246 requires that all prescription drugs bear a label containing, *inter alia,* the name and address of the pharmacy, the name of the prescribing doctor and his directions, the name and strength per unit dose of the drug, the name of the patient, the date of the prescription, and the expiration date. *See also* WAC 360–16–255. 21 U.S.C. § 353(b)(2) contains similar federal requirements.

judgment and dismissal of all claims against them, contending they had no duty to warn their customers of the potential hazards of a prescription drug. The trial court granted the pharmacists' motion and dismissed McKee's claims. We granted direct review.

■ Initially we note that McKee did not assign error to the trial court's dismissal of her strict liability and breach of warranty claims, as required by RAP 10.3. Aside from citing the product liability act and arguing that the defendant pharmacists are "product manufacturers" thereunder, McKee provides no argument or legal authority in support of her strict liability and breach of warranty claims. We will not consider issues on appeal that are not raised by an assignment of error or are not supported by argument and citation of authority. *Transamerica Ins. Group v. United Pac. Ins. Co.,* 92 Wn.2d 21, 28–29, 593 P.2d 156 (1979). Therefore, we will address McKee's negligence claim only.

## I

A summary judgment motion may be granted under CR 56(c) only if the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue concerning any material fact, and the moving party is entitled to judgment as a matter of law. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982); *Barrie v. Hosts of Am., Inc.,* 94 Wn.2d 640, 646, 618 P.2d 96 (1980). All facts submitted and all reasonable inferences from the facts must be considered by the court in the light most favorable to the nonmoving party. *Wilson,* at 437; *Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.,* 81 Wn.2d 528, 530, 503 P.2d 108 (1972); *Barber v. Bankers Life & Cas. Co.,* 81 Wn.2d 140, 142, 500 P.2d 88 (1972). Motions for summary judgment should only be granted, if reasonable persons could only reach but one conclusion from all the evidence. *Wilson,* at 437; *Morris v. McNicol,* 83 Wn.2d 491, 494–95, 519 P.2d 7 (1974).

■ For purposes of CR 56(e) the affidavit must: (1) be made on personal knowledge, (2) set forth admissible evidentiary facts, and (3) affirmatively show that the affiant is competent to testify to the matters stated therein. *Bernal v. American Honda Motor Co.,* 87 Wn.2d 406, 412, 553 P.2d 107 (1976); *Meadows v. Grant's Auto Brokers, Inc.,* 71 Wn.2d 874, 878, 431 P.2d 216 (1967). Competency to testify can reasonably be found by the trial court. *Bernal,* at 413. Furthermore, "[t]he qualifications of an expert are to be judged by the trial court, and its determination will not be set aside in the absence of a showing of abuse of discretion." *Bernal,* at 413, quoting *Nordstrom v. White Metal Rolling & Stamping Corp.,* 75 Wn.2d 629, 642, 453 P.2d 619 (1969).

The gravamen of this case is whether the plaintiff met her burden under RCW 7.70.040,[3] of proving the defendants' failure to exercise the degree of care, skill, and learning expected of a reasonably prudent pharmacist licensed in the state of Washington at the time.

■ The only evidence offered by McKee concerning the standard of care of a pharmacist practicing in Washington was an affidavit of an Arizona physician. The physician was not licensed to practice medicine in Washington, nor was he a pharmacist. We recently reiterated the rule that to establish the standard of care required of professional practitioners, that standard must be established by the testimony of experts who practice in the same field. The duty of physicians must be set forth by a physician, the duty of structural engineers by a structural engineer and that of any expert must be proven by one practicing in the same field—

---

[3]RCW 7.70.040 reads:

"The following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care.

"(1) The health care provider failed to exercise that degree of care, skill, and learning expected of a *reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington,* acting in the same or similar circumstances;

"(2) Such failure was a proximate cause of the injury complained of." (Italics ours.)

by one's peer. *Young v. Key Pharmaceuticals, Inc.,* 112 Wn.2d 216, 770 P.2d 182 (1989). So here, only a pharmacist who knew the practice and standard of care in this state could establish the standard of care for the defendants. Contrary to the requirements of RCW 7.70.040 the affidavit does not assert the standard of care of a pharmacist in this state. Therefore, for purposes of CR 56(e) the affidavit does not show that the affiant was qualified to prove the standard of care of a pharmacist in the state of Washington.

The trial court determined that no genuine issues of material fact remained. Therefore, the moving parties were entitled to judgment as a matter of law. We have thoroughly reviewed all the pleadings, affidavits, depositions and admissions on file and affirm the granting of the summary judgment by the trial court.

## II

While we need go no further, it is appropriate that we discuss the merits of the primary issue raised because of the importance of the issue and the public interest therein. McKee contends the pharmacists had a duty to warn her of the harmful side effects of long–term use of Plegine, and that she should recover from the defendants under RCW 7.70.030(1). Recovery is provided under RCW 7.70.030(1) where: "[t]hat injury resulted from the failure of a health care provider to follow the accepted standard of care[.]"

Chapter 7.70 of the RCW outlines actions for injuries resulting from health care. A pharmacist is defined as a health care provider under RCW 7.70.020. RCW 7.70.030 requires that the plaintiff prove each fact essential to an award by a preponderance of the evidence.

The elements required to prove that an injury resulted from a failure to follow the accepted standard of care are stated in RCW 7.70.040. Although a pharmacist's duty to warn of potential hazards associated with a prescription drug is an issue of first impression in Washington, we choose to join the majority of those states with statutes similar to RCW 7.70.040 which have addressed this issue

holding that a pharmacist has no duty to warn. In Florida,[4] in a case almost factually identical, the court answered two questions which are applicable here: First, does a licensed pharmacist have a duty not only to properly fill a prescription but to warn the customer of dangerous propensities of the prescription drug? Second, does a licensed pharmacist who has actual or constructive knowledge of a customer's dependency and addiction have a duty to warn the treating physician of this fact? The court answered in the negative to both questions.

> [A] supplier of drugs has no duty to fail or refuse to supply a customer with drugs for which the customer has a valid and lawful prescription from a licensed physician, nor any duty to warn said customer of the fact that one using the prescribed drug for any period of time could or would become addicted to the use thereof and would become physically and psychologically dependent thereon . . .

*Pysz v. Henry's Drug Store*, 457 So. 2d 561, 561–62 (Fla. Dist. Ct. App. 1984). The physician has the duty to know the drug that he is prescribing and to properly monitor the patient. Here the druggist properly filled a lawful prescription.

Similarly, the Michigan Court of Appeals held that a pharmacist owes a duty to properly fill the lawful prescriptions of its customers. *Adkins v. Mong*, 168 Mich. App. 726, 729, 425 N.W.2d 151 (1988). "[A] pharmacist is held to a very high standard of care in performing this duty and may be held liable in tort for any breach." *Adkins*, at 729. However, "'a pharmacist has no duty to warn the patient of possible side effects of a prescribed medication where the

---

[4]Fla. Stat. § 768.45 (1985) is renumbered as 766.102 (1988) and provides for standards of recovery in medical negligence actions. Like our RCW 7.70.040, Florida provides that in an action against a health care provider:

". . . the claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers."

prescription is proper on its face and neither the physician nor the manufacturer has required that any warning be given to the patient by the pharmacist.'" *Adkins,* at 728, quoting *Stebbins v. Concord Wrigley Drugs, Inc.,* 164 Mich. App. 204, 218, 416 N.W.2d 381 (1987). Indeed, "there exists no legal duty on the part of a pharmacist to monitor and intervene with a customer's reliance on drugs prescribed by a licensed treating physician." *Adkins,* at 732. It is the physician who owes the duty to the patient to monitor prescription drug usage and a pharmacist will not be found liable for lawfully filling a prescription issued by a licensed physician. *Adkins,* at 730.

This court has addressed a closely related issue—the manufacturer's duty to warn. Adopting the "learned intermediary" doctrine, we held in *Terhune v. A.H. Robins Co.,* 90 Wn.2d 9, 577 P.2d 975 (1978) that a prescription drug manufacturer's duty to warn of dangers associated with its product runs only to the physician; it is the physician's duty to warn the ultimate consumer.

The reasons for this rule are apparent.

Where a product is available only on prescription or through the services of a physician, the physician acts as a "learned intermediary" between the manufacturer or seller and the patient. It is his duty to inform himself of the qualities and characteristics of those products which he prescribes for or administers to or uses on his patients, and to exercise an independent judgment, taking into account his knowledge of the patient as well as the product. The patient is expected to and, it can be presumed, does place primary reliance upon that judgment. The physician decides what facts should be told to the patient. Thus, if the product is properly labeled and carries the necessary instructions and warnings to fully apprise the physician of the proper procedures for use and the dangers involved, the manufacturer may reasonably assume that the physician will exercise the informed judgment thereby gained in conjunction with his own independent learning, in the best interest of the patient.

(Footnote omitted.) *Terhune,* at 14.

The Illinois courts have also adopted the learned intermediary doctrine. In *Leesley v. West,* 165 Ill. App. 3d 135, 518 N.E.2d 758 (1988), the court expanded the learned

intermediary doctrine to apply to pharmacies. In *Kirk v. Michael Reese Hosp. & Med. Ctr.,* 117 Ill. 2d 507, 513 N.E.2d 387, 395 (1987), *cert. denied,* 108 S. Ct. 1077 (1988), the court held a doctor, as a learned intermediary, decides which available drug fits the patient's needs, choosing which facts from the various warnings should be conveyed to the patient. The extent of disclosure is a matter of medical judgment. *Kirk,* at 523. The opinion continues:

> ". . . It is the physician who is in the best position to decide when to use and how and when to inform his patient regarding risks and benefits pertaining to drug therapy." (W. Prosser & W. Keeton, The Law of Torts sec. 96, at 688 (5th ed. 1984).) As such, the manufacturer is only obligated to adequately warn the physicians, who decide which drug to use and which warnings to provide. The drug companies are not required to warn hospital personnel because they do not select the proper drugs for the patient and prescribe them.

*Kirk,* 117 Ill. 2d at 523. Indeed "[t]he foreseeability of injury to an individual consumer in the absence of any particular warning also varies greatly depending on the medical history and condition of the individual—facts which we cannot reasonably expect the pharmacist to know." *Leesley,* at 142.

In North Carolina, the court held that physicians offered their professional services and skill for which they are paid by their patients. This is the basis of the relationship between the physician and his patient. Only the doctor knows the myriad of factors that went into deciding upon the proper medication, proper amount and proper frequency of ingestion. The pharmacist must fill the prescription as directed. Where there is no allegation that the product was other than what it was supposed to be, there is no negligence. *Batiste v. American Home Prods. Corp.,* 32 N.C. App. 1, 231 S.E.2d 269, 274 (1977).[5]

---

[5]The *Batiste* opinion states in part: "She alleged that she obtained a prescription from her physician and that defendant druggist filled that prescription. There is no allegation that defendant druggist added anything thereto or selected anything for plaintiff to take. Nor is this a situation where plaintiff made her choice from items selected and displayed by the druggist for sale to the general

The relationship between the physician–patient–manufacturer applies equally to the relationship between the physician–patient and pharmacist. In both circumstances the patient must look to the physician, for it is only the physician who can relate the propensities of the drug to the physical idiosyncrasies of the patient. "It is the physician who is in the best position to decide when to use and how and when to inform his patient regarding risks and benefits pertaining to drug therapy." W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 96, at 688 (5th ed. 1984).

In *Young v. Key Pharmaceuticals, Inc.,* 112 Wn.2d 216, 770 P.2d 182 (1989), we stated, "proper dosages of medication is not within the scope of matters on which nonphysicians are competent . . ." *Young,* at 230. We went on to hold that "pharmacists are not doctors and are not licensed to prescribe medication because they lack the physician's rigorous training in diagnosis and treatment." *Young,* at 230.

Neither manufacturer nor pharmacist has the medical education or knowledge of the medical history of the patient which would justify a judicial imposition of a duty to intrude into the physician–patient relationship. In deciding whether to use a prescription drug, the patient relies primarily on the expertise and judgment of the physician. Proper weighing of the risks and benefits of a proposed drug treatment and determining what facts to tell

---

public. Here the drug purchased by plaintiff was not available to the general public in the sense that it was available for purchase by any customer who came in the drug store, selected it from the shelf, and paid the price therefor. It was available only to those who had previously seen their physician and obtained from the physician a prescription directing the druggist to supply the drug. Obviously the plaintiff patient did not rely on the druggist's skill or judgment in assuming that the drug would be fit for its intended purpose. This reliance had been properly placed with her physician. We are not willing to extend the applicability of implied warranties of fitness and merchantability to this situation and agree with the trial court in dismissing these two claims for relief." (Citations omitted.) *Batiste,* at 12.

the patient about the drug requires an individualized medical judgment based on knowledge of the patient and his or her medical condition. The physician is not required to disclose all risks associated with a drug, only those that are material. *Smith v. Shannon,* 100 Wn.2d 26, 31, 666 P.2d 351 (1983). It is apparent that a pharmacist would not be qualified to make such a judgment as to materiality. Moreover, circumstances may exist justifying nondisclosure of even material risks. *See Holt v. Nelson,* 11 Wn. App. 230, 240–41, 523 P.2d 211, 69 A.L.R.3d 1235 (1974) (enumerating exceptions to the informed consent doctrine). Requiring the pharmacist to warn of potential risks associated with a drug would interject the pharmacist into the physician–patient relationship and interfere with ongoing treatment. We believe that duty, and any liability arising therefrom, is best left with the physician.

A majority of other jurisdictions that have addressed the issue have likewise refused to impose a duty to warn on the pharmacist. *E.g., Jones v. Irvin,* 602 F. Supp. 399 (S.D. Ill. 1985); *Ramirez v. Richardson–Merrell, Inc.,* 628 F. Supp. 85, 88 (E.D. Pa. 1986); *Eldridge v. Eli Lilly & Co.,* 138 Ill. App. 3d 124, 485 N.E.2d 551 (1985); *Makripodis v. Merrell–Dow Pharmaceuticals, Inc.,* 361 Pa. Super. 589, 597–98, 523 A.2d 374 (1987) (strict liability theory). As said in *Ramirez,* at 88:

> To impose a duty to warn on the pharmacist, however, would be to place the pharmacist between the physician who, having prescribed the drug presumably knows the patient's present condition as well as his or her complete medical history, and the patient. Such interference in the patient–physician relationship can only do more harm than good. As the court in *Batiste v. American Home Products Corp.,* 32 N.C.App. 1, 231 S.E.2d 269, 274 (1977) emphasized, when holding that a pharmacy could not be held liable in negligence for its failure to warn the plaintiff of the potential side effects associated with an oral contraceptive drug, defendant is not a physician and is not qualified or licensed to advise plaintiff with respect to the best medication for her use. *See also Ingram v. Hook's Drugs, Inc.,* Ind. App., 476 N.E.2d 881 (1985).

McKee cites RCW 18.64.011(11) as supporting a duty to warn. RCW 18.64.011(11) defines the "practice of pharmacy." RCW 18.64.011(11) reads:

> "Practice of pharmacy" includes the practice of and responsibility for: Interpreting prescription orders; the compounding, dispensing, labeling, administering, and distributing of drugs and devices; the monitoring of drug therapy and use; the initiating or modifying of drug therapy in accordance with written guidelines or protocols previously established and approved for his or her practice by a practitioner authorized to prescribe drugs; the participating in drug utilization reviews and drug product selection; the proper and safe storing and distributing of drugs and devices and maintenance of proper records thereof; the providing of information on legend drugs which may include, but is not limited to, the advising of therapeutic values, hazards, and the uses of drugs and devices.

RCW 18.64.011(11) is applicable to pharmacists. However contrary to McKee's contentions it does not require that warnings concerning the prescription be given to the patient. Initially we note this statute is definitional and does not purport to set forth duties. Further, WAC 360–12–150 states that the term "monitoring drug therapy" as used in the statute shall include duties such as measuring patient vital signs and ordering and evaluating laboratory test results. The provision is not meant to apply to the neighborhood pharmacy but only to pharmacists practicing in an institutional setting.[6] Nor does the latter quoted definition create a mandatory duty on all pharmacists to warn

---

[6]WAC 360–12–150 reads:

**Monitoring of drug therapy by pharmacists.** The term "monitoring [of] drug therapy" used in RCW 18.64.011(11) shall mean a review of the drug therapy regimen of patients by a pharmacist for the purpose of evaluating and rendering advice to the prescribing practitioner regarding adjustment of the regimen. Monitoring of drug therapy shall include, but not be limited to:

(1) Collecting and reviewing patient drug use histories;

(2) Measuring and reviewing routine patient vital signs including, but not limited to, pulse, temperature, blood pressure and respiration; and

(3) Ordering and evaluating the results of laboratory tests relating to drug therapy including, but not limited to, blood chemistries and cell counts, drug levels in blood, urine, tissue or other body fluids, and culture and sensitivity tests when performed in accordance with policies and procedures or protocols

customers of all dangers associated with a drug.[7] That duty may be appropriate where the pharmacist has prescriptive authority, a question not presented here. *See* RCW 18.64-.011(11) and WAC 360–12–140.

## III

McKee contends that although a pharmacist may not have a duty to warn of hazardous side effects in every case, here the pharmacists knew or should have known from the manufacturer's literature and from the fact that McKee did not appear obese,[8] that her physician was misprescribing Plegine, giving rise to a duty to warn her or to question the physician. In support of her argument, McKee relies on *Hand v. Krakowski,* 89 A.D.2d 650, 453 N.Y.S.2d 121 (1982) and *Riff v. Morgan Pharmacy,* 353 Pa. Super. 21, 508 A.2d 1247 (1986).

In *Hand,* a pharmacy dispensed drugs which were contraindicated with alcohol to an alcoholic, resulting in the patient's death. It was undisputed that the pharmacist had personal knowledge that the patient was an alcoholic. The court held that since the pharmacy knew the customer was

---

applicable to the practice setting, which have been developed by the pharmacist and prescribing practitioners and which include appropriate mechanisms for reporting to the prescriber monitoring activities and results.

We are unaware of any practice wherein pharmacists must collect and review patient drug use histories. Such activity could intrude into the privacy of the customer and bring forth a number of issues not before us in this action. Further, we are unaware of any practice by pharmacists which includes taking the pulse, temperature, and blood pressure, and checking the respiration of a customer who enters a drug store bearing, in hand, a prescription from his doctor.

[7]WAC 360–16–250 specifically requires the pharmacist to orally explain the directions for use and give any additional information necessary to assure proper use of the drug. We interpret this to include nonjudgmental information, not affecting a decision to take or continue using a drug, such as: whether to take the drug on an empty or full stomach, substances to avoid while using the drug, or not to drive or use heavy machinery while taking the drug. We do not decide whether failure to give this information is actionable. *See* Brushwood & Simonsmeier, *Drug Information for Patients: Duties of the Manufacturer, Pharmacist, Physician, and Hospital,* 7 J. Legal Med. 279, 282, 308–20 (1986).

[8]McKee is 5'4" tall and states that her maximum weight while using Plegine was 138 pounds.

alcoholic and knew or should have known the drugs were contraindicated for that particular customer, an issue of fact existed as to whether the pharmacy had a duty to warn the decedent and to question the prescribing physician.

*Riff* involved a prescription on which the doctor had failed to state the maximum safe dosage. The pharmacy took no steps to correct the error and the patient suffered an overdose. Expert testimony established that the pharmacy was negligent in failing to be aware of obvious inadequacies on the face of the prescription and to warn the patient or notify the prescribing physician.

█ Both of these cases involved obvious or known errors in the prescription. In *Hand,* the court emphasized that the drug was contraindicated, "refer[ring] to a circumstance under which the drug must never be given. It is absolute and admits of no exceptions[.]'" 89 A.D.2d at 651, citing *Baker v. St. Agnes Hosp.,* 70 A.D.2d 400, 402, 421 N.Y.S.2d 81 (1979). We agree pharmacists should have a duty to be alert for patent errors in a prescription, for example: obvious lethal dosages, inadequacies in the instructions, *known* contraindications,[9] or incompatible prescriptions,[10] and to take corrective measures.

The alleged negligence in this case, however, involved an exercise of the physician's judgment in determining whether Plegine was an appropriate drug for McKee's condition and the length of time she could safely use it. It is

---

[9]Pharmacies in Washington are required to maintain a patient medication record for each patient, which may include information on "allergies, idiosyncrasies, or chronic condition which may relate to drug utilization." WAC 360–19–030(1)(i), –040(1)(g). We recognize, however, that a pharmacist typically does not have the patient's complete medical history and there may be occasions where the pharmacist is unaware a drug is contraindicated.

[10]WAC 360–19–050 requires a pharmacist to review a patient's medication record upon receipt of a prescription for possible drug interactions, reactions or duplications, and to contact the prescriber if needed. WAC 360–19–080(2) states: "If in the judgment of the dispenser, the prescription presented for dispensing is determined to cause a potentially harmful drug interaction or other problem due to a drug previously prescribed by another practitioner, the dispenser may communicate this information to the prescribers."

undisputed that McKee's physician monitored her condition throughout the time she used Plegine, requiring periodic checkups during which he would check her weight and blood pressure. On at least one occasion he required her to stop using Plegine for several months. Imposing a duty such as McKee urges would, in essence, require the pharmacist to question the physician's judgment regarding the appropriateness of each customer's prescription. Sound policy reasons exist for not imposing such a duty.

As noted, without benefit of a patient's medical history, the pharmacist is not qualified to determine the propriety of a particular drug regimen. That determination certainly cannot be made from a patient's physical appearance alone. As an Illinois court observed:

> The propriety of a prescription depends not only on the propensities of the drug but also on the patient's condition. A prescription which is excessive for one patient may be entirely reasonable for the treatment of another. To fulfill the duty which the plaintiff urges us to impose would require the pharmacist to learn the customer's condition . . . To accomplish this, the pharmacist would have to interject himself into the doctor–patient relationship and practice medicine without a license.

*Eldridge v. Eli Lilly & Co.,* 138 Ill. App. 3d at 127.

A physician may often have valid reasons for deviating from the drug manufacturer's recommendations based on a patient's unique condition. The duty which McKee urges would result in the pharmacist second guessing numerous prescriptions to avoid liability. This would not only place an undue burden on pharmacists, but would likely create antagonistic relations between pharmacists and physicians. As stated in *Jones v. Irvin,* 602 F. Supp. at 402:

> It is the duty of the prescribing physician to know the characteristics of the drug he is prescribing, to know how much of the drug he can give his patient, to elicit from the patient what other drugs the patient is taking, to properly prescribe various combinations of drugs, to warn the patient of any dangers associated with taking the drug, to monitor the patient's dependence on the drug, and to tell the patient when and how to take the drug. Further, it is the duty of the patient to notify the physician of the other drugs the patient is taking. Finally,

it is the duty of the drug manufacturer to notify the physician of any adverse effects or other precautions that must be taken in administering the drug. Placing these duties to warn on the pharmacist would only serve to compel the pharmacist to second guess every prescription a doctor orders in an attempt to escape liability.

(Citation omitted.) Moreover, unnecessary warnings to the patient could cause unfounded fear and mistrust of the physician's judgment, jeopardizing the physician–patient relationship and hindering treatment.

Pharmacists are defined as health care providers under RCW 7.70.020. The elements necessary to prove that a health care provider did not follow the accepted standard of care are found in RCW 7.70.040 previously quoted.

It is inappropriate to interpret this statute to allow any testimony regarding the practice of pharmacy as the proper standard of care. RCW 18.64 discusses pharmacists and their expected duties. The "practice of pharmacy" as defined by RCW 18.64.011(11) reads:

> "Practice of pharmacy" includes the practice of and responsibility for: Interpreting prescription orders; the compounding, dispensing, labeling, administering, and distributing of drugs and devices; . . . *the providing of information on legend drugs which may include, but is not limited to,* the advising of therapeutic values, hazards, and the uses of drugs and devices.

(Italics ours.)

Nowhere in RCW 18.64 are pharmacists required to disclose all information when filling a prescription. RCW 18.64.011(11) provides that information *may* include therapeutic values, hazards and the use of the drug. Further, WAC 360–16–250 provides "the pharmacist . . . must orally explain to the patient or the patient's agent the directions for use and any additional information, in writing if necessary, to assure the proper utilization of the medication or device prescribed."

Plegine is a legend drug; it may be dispensed on prescription only. As a legend drug, the pharmacists *may* have given McKee information about the therapeutic values or hazards of Plegine, however, they were not required to do

so. McKee had a prescription for every refill she received, therefore, she was constantly monitored by her physician.

Nothing in RCW 18.64 nor in WAC 360–16 requires pharmacists to disclose all contraindications or warnings. If the Legislature intended pharmacists to be liable for failure to warn, the Legislature could have so provided.

## IV

McKee also contends the pharmacists were negligent in failing to provide her with the manufacturer's package insert. Prescription drugs are exempt from the package labeling requirements for drugs sold over the counter. 21 U.S.C. § 353(b)(2). Instead, the Food and Drug Administration (FDA) requires manufacturers to accompany each package of prescription drugs with a package insert describing the drug and detailing its uses, contraindications, potential harmful effects, and directions to the physician for use. 21 C.F.R. §§ 201.100(d), 201.56, 201.57. Consistent with the learned intermediary doctrine, the insert is directed to the physician or other health care provider; its contents are reprinted in the PDR. Brushwood, *The Informed Intermediary Doctrine and the Pharmacist's Duty To Warn,* 4 J. Legal Med. 349, 356 (1983). There is no regulatory requirement that pharmacists provide consumers with this insert. We decline to impose such a duty for several reasons.

First, such a requirement would place an unknown burden on pharmacists. As noted, manufacturers are not required to provide consumers with their warnings. Although here the amount of McKee's prescription coincided with the size of the manufacturer's package, drugs are often packaged in large units, containing only one package insert, and must be divided to fill numerous prescriptions. Thus, pharmacists would have the economic and logistic burden of copying the inserts as well as developing a storage, filing and retrieval system to ensure the current insert

is dispensed with the proper drug. From a liability stand-point, the pharmacist may also need a system for proving the patient received the insert.

More importantly, such a duty may not be without risk. Package inserts, written for the physician, are detailed and technical, and may confuse and frighten the patient. In 1980, the FDA adopted regulations requiring *patient* package inserts (PPI) directed to the consumer. These were information leaflets, in lay language, to be produced by manufacturers and distributed by pharmacists at the time a prescription was filled. 40 Fed. Reg. 60,754 (1980). This program was rescinded, however, in 1982. 47 Fed. Reg. 39,147 (1982). Patient inserts are still required for oral contraceptives and several other drugs, but not Plegine. *See* Brushwood & Simonsmeier, *Drug Information for Patients: Duties of the Manufacturer, Pharmacist, Physician, and Hospital,* 7 J. Legal Med. 270, 280 n.6 (1986) (listing PPI requirements).

Some have argued that direct warnings to the consumer, once the patient has made the decision to use a drug and the physician is no longer available to counsel, may be counterproductive and are contrary to the rationale behind the learned intermediary doctrine. Brushwood & Simonsmeier, 7 J. Legal Med. at 283–84; Brushwood, 4 J. Legal Med. at 357; *Makripodis,* 361 Pa. Super. at 597. As one commentator stated:

> The most innocuous of drugs, and those generally considered safe, effective, and best for a given problem may, nevertheless, produce serious side effects in some patients. A description of risks in a package insert drafted for the self–protection of the drug company and the FDA could disturb even the most sophisticated patient. Placing this type of information in the hands of patients after the course of treatment had been agreed on with the physician would add an uncontrollable and often unknown factor to the treatment process. The patient might make a new judgment not to take the medication as directed.

Curran, *Package Inserts for Patients: Informed Consent in the 1980's,* 305 New Eng. J. Med. 1564, 1565–66 (1981).

Moreover, a requirement that consumers receive the manufacturer's insert effectively abrogates the learned intermediary doctrine and could impact not only pharmacists' liability, but that of manufacturers and physicians as well.

While some form of written warnings to consumers may well be beneficial, in light of the potential ramifications of such a decision and the pervasive regulation in this area, if such warnings are to be required, the duty should be imposed by the Legislature. The Legislature can better assess the relative costs and benefits involved, and determine what form any warnings should take. The legislative process can better reconcile the interests of all persons concerned with the imposition of such a duty: pharmaceutical manufacturers, medical societies, retail pharmacists, health care insurers, consumer groups and patient representative groups. We find before us a single injured plaintiff and two drug store owners. Holding that the drug store owners could be negligent for failing to warn her about the drug her doctor prescribed would muddy the waters as to where responsibility lies up and down the chain of health care. We decline to do so.

## CONCLUSION

In summary, our holding is narrow. The pharmacist still has a duty to accurately *fill* a prescription, *see* Annot. *Liability of Manufacturer or Seller for Injury Caused by Drug or Medicine Sold*, 79 A.L.R.2d 301 (1961), and to be alert for clear errors or mistakes in the prescription. The pharmacist does not, however, have a duty to question a judgment made by the physician as to the propriety of a prescription or to warn customers of the hazardous side effects associated with a drug, either orally or by way of the manufacturer's package insert.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). *Hontz v. State*, 105 Wn.2d 302, 311, 714 P.2d 1176

(1986). The defendants owed no duty to the plaintiff and are entitled to judgment as a matter of law. The trial court's order is affirmed.

DOLLIVER, ANDERSEN, DURHAM, and SMITH, JJ., concur.

DORE, J. (dissenting)—The claims of plaintiff, Elaine McKee, relevant to this appeal, arise from the defendant pharmacists' continual refilling of a prescription of Plegine for a period of 10 years. During 1974 plaintiff, Elaine McKee, believed that she had a weight problem. At that time, Elaine was 20 years of age and otherwise in good health. She went to see her longtime family physician, defendant Dr. Michael Shanahan. Dr. Shanahan prescribed the drug, Plegine and the defendant pharmacy dispensed it to McKee for a period of 10 years. The plaintiff stated in her deposition that during portions of the time these amphetamines were dispensed to her she was well within her target weight range, but felt the drug was saving her life because she felt she was a defective person.

Prior to dispensing Plegine to the plaintiff, the defendant pharmacists elected to remove the manufacturer's warnings from the medication. Defendant Mezistrano testified that he removed the manufacturer's package insert warning instructions in dispensing bottles of 100 Plegine tablets (the quantities dispensed to Elaine). In fact, Mezistrano testified that he had decided that the package warnings were too complicated for the customers to understand them. There was testimony that the druggist could have placed his label on the other side of the capsule container without disturbing the manufacturer's warning.

The nature of the drug, Plegine, is vital to the plaintiff's contentions concerning the duty of the pharmacists. Plegine is an amphetamine. The drug was utilized for weight control, but was potentially addictive and possessed a number of very dangerous side effects.

The majority admits that for 10 years the pharmacists Sidran and Mezistrano removed a label from the Plegine

prescription sold to McKee, which contained the following warning:

**Indications:** PLEGINE (phendimetrazine tartrate) is indicated in the management of exogenous obesity as a short term adjunct (*a few weeks*) in a regimen of weight reduction based on caloric restriction. The limited usefulness of agents of this class should be measured against possible risk factors inherent in their use. (See Actions).

**Warnings: DRUG DEPENDENCE:** Plegine is related chemically and pharmacologically to the amphetamines. Amphetamines and related stimulant drugs have been extensively abused, and the possibility of abuse of Plegine should be kept in mind when evaluating the desirability of including a drug as part of a weight reduction program . . . Tolerance to the anorectic effect of Plegine (phendimetrazine tartrate) develops within a few weeks. When this occurs, its use should be discontinued; the maximum recommended dose should not be exceeded.

**Precautions:** . . . The least amount feasible should be prescribed or dispensed at one time in order to minimize the possibility of an overdose.

Clerk's Papers, at 115, 749, 756. Majority, at 703. Incredibly, the pharmacists never mentioned the "few weeks" warning and possible side effects to McKee, or the recommendation that the drug should be *discontinued* after several weeks. Maybe one might understand a delay of such a warning over several months, but not a delay of 10 years.

I would have no difficulty holding that Sidran and Mezistrano were negligent as a matter of law in not warning McKee of Plegine's side effects. But that issue is not presented here. The sole issue is whether McKee presented enough evidence in response to the defendants' motion for summary judgment to take the issue of negligence to a jury. Since McKee did present evidence from which a jury could infer that the pharmacists had failed to exercise the due care required of a reasonably prudent health care provider, the defendant's summary judgment motion should have been denied.

I would reverse the trial court's decision and remand for trial.

PHARMACISTS OWE A DUTY OF DUE CARE

There is no question that a pharmacist has a duty of due care. It is established and defined by statute. A pharmacist is defined as a "health care provider" in RCW 7.70.020. RCW 7.70.040 provides in part:

> The following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:
> (1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances[.]

The "reasonably prudent practitioner" standard of this statute is distinct from and higher than the "average practitioner" standard of the common law. The question is what the *public* would expect a reasonably prudent practitioner to do, not what his peers would expect. *Harris v. Groth,* 99 Wn.2d 438, 444–45, 663 P.2d 113 (1983).

Since the question is what the public judgment of reasonable prudence is, the issue of due care under RCW 7.70-.040 is an issue of fact on which expert testimony will ordinarily be received. This court wrote in *Harris*:

> In general, expert testimony is required when an essential element in the case is best established by an opinion which is beyond the expertise of a layperson. Medical facts in particular must be proven by expert testimony unless they are "observable by [a layperson's] senses and describable without medical training". Thus, expert testimony will generally be necessary *to establish the standard of care* and most aspects of causation.

(Footnote and citations omitted. Italics mine.) *Harris,* at 449. The court in a footnote stated:

> This will remain true even under the reasonable prudence standard of care, since *the factual question of whether a particular medical practice is reasonably prudent* is generally neither observable by or describable by a layperson. In some exceptional circumstances, laypersons may be capable of balancing the costs and benefits of a particular procedure and deciding whether it was reasonably prudent.

(Italics mine.) *Harris*, at 449 n.6. The issue of a pharmacist's duty of due care is therefore a question of fact for a jury, not an issue of law for the court.

The majority cites several cases for the proposition that the existence of a duty is a question of law. All of these cases consider the existence of a common law duty of due care. None of the cases involved conduct governed by an applicable statute, like RCW 7.70.040, which itself imposes a duty of care. The cases cited by the majority are distinguishable. RCW 7.70.040 supersedes the common law, and whether or not a duty should be imposed is no longer an open question. The only remaining issue is the specific content or application of the duty in the particular case, and that is a question for the jury. Put another way, if the existence of a duty is a question of law, in this case the statute provides a clear answer to that question: yes. The majority's wrestling with the question of whether a duty of due care exists is, at best, unnecessary and, at worst, a usurpation of the Legislature's power.

The majority argues that RCW 18.64.011(11) determines the standard of care for pharmacists, rather than a jury with the assistance of experts under RCW 7.70.040. Majority, at 717. The passage the majority relies on states that:

"Practice of pharmacy" includes the practice of and responsibility for: Interpreting prescription orders; the compounding, dispensing, labeling, administering, and distributing of drugs and devices; . . . *the providing of information on legend drugs which may include, but is not limited to,* the advising of therapeutic values, hazards, and the uses of drugs and devices.

Stressing the word "may" in this passage, the majority concludes that the pharmacist's duty of due care does not include providing warnings on dangerous drugs because such warnings are optional. This argument has no merit because the passage has been taken out of context. It has nothing whatever to do with the standard of care which governs pharmacists.

RCW 18.64.011(11) is a definition of what constitutes the "practice of pharmacy" for the purposes of RCW 18.64

generally. For example, RCW 18.64.020 makes it unlawful for a person "to practice pharmacy" without a license. The passage quoted by the majority, when placed in the proper context, means that one who advises on the therapeutic values and hazards of drugs may be committing an act which is illegal without a license. In drafting RCW 18.64-.011(11) the Legislature was considering an entirely different question from due care, and the majority reads something into the statute which is not there. Furthermore, the proposition that RCW 18.64.011(11) defines the standard of due care is directly contrary to the holding of *Harris* that the due care of health care providers under RCW 7.70.040 is a question of fact to be decided by the jury with the assistance of expert testimony. *Harris,* at 449.

Since the majority concludes that the pharmacists owed McKee no duty to warn of the adverse effects of Plegine, it affirms the grant of summary judgment. It is impossible to tell from the majority opinion, however, which of two distinct questions it is attempting to answer. It is clear that neither one is presented here. First, to ask whether a pharmacist owes a duty to warn as a matter of law might mean: Is there a legal duty, distinct from the duty of due care, which the pharmacists owed McKee? Second, to ask whether a pharmacist owes a duty to warn as a matter of law might mean: Was the pharmacists' failure to warn McKee so extreme a failure that it breached their duty of due care as a matter of law? The pharmacists' motion for summary judgment raises neither of these questions. The *only issue* is whether there is evidence from which a jury could infer that the pharmacists violated their duty of due care.

These distinctions can be illustrated by our prior cases on the duties of health care professionals. In *Gates v. Jensen,* 92 Wn.2d 246, 595 P.2d 919 (1979) we recognized a duty to warn distinct from the general health care professional's duty of due care. The plaintiff had offered a jury instruction which read in part:

> "You are instructed that an ophthalmologist has a duty to advise his patient of all relevant, material information concerning the condition of the patient's eyes that the patient will need to make an informed decision respecting the alternative methods of examination for eye disease, of the reasonably foreseeable risks of each alternative, and of no such examination at all. Failure to so advise the patient is negligence.

*Gates,* at 249 n.2. This duty to warn was not part of the duty of due care, but a separate duty grounded in the physician's status as a fiduciary entrusted with the care of the patient's body. *Gates,* at 250. The majority at times seems to be discussing a duty to warn distinct from the duty of due care, similar to that recognized in *Gates.* McKee, however, has never argued such a theory. Instead, she contends only that there was evidence of a violation of the duty of due care under RCW 7.70.040 sufficient to preclude summary judgment. Aside from its patently flawed contention that RCW 18.64.011(11) defines the standard of care, the majority ignores that question.

The majority at other times seems to be discussing whether the pharmacist violated the standard of due care as a matter of law. That was the ground of our decision in *Helling v. Carey,* 83 Wn.2d 514, 519, 519 P.2d 981, 67 A.L.R.3d 175 (1974) in which we recognized that, as a matter of law, failure to test for glaucoma in patients under 40 violated the health care professional's duty to exercise reasonable prudence.

> Under the facts of this case reasonable prudence required the timely giving of the pressure test to this plaintiff. The precaution of giving this test to detect the incidence of glaucoma to patients under 40 years of age is so imperative that irrespective of its disregard by the standards of the op*h*thalmology profession, it is the duty of the courts to say what is required to protect patients under 40 from the damaging results of glaucoma.
>
> We therefore hold, as a matter of law, that the reasonable standard that should have been followed under the undisputed facts of this case was the timely giving of this simple, harmless pressure test to this plaintiff and that, in failing to do so, the defendants were negligent . . .

In *Helling,* the judgment appealed from had been entered on a jury verdict for defendants, and so the question

whether the defendant had been negligent as a matter of law was before the court. That question might also be raised by a plaintiff's motion for summary judgment. However, the issue of negligence as a matter of law is not raised by a defendant's motion for summary judgment, such as the one we have here. Where the defendant moves for summary judgment, the plaintiff need only establish that there is an issue of fact for the jury, not that the defendant violated the standard of due care as a matter of law. McKee established that there was a question of fact for the jury as to whether the pharmacist had breached the ordinary negligence standard of due care.

### WASHINGTON STATUTORY LAW, REGULATION, AND POLICY CONSIDERATIONS REQUIRE IMPOSITION OF A PHARMACIST'S DUTY TO ADVISE CUSTOMERS

Two commentators in 1986 pharmacological literature identified Washington as a state that imposes a statutory duty on pharmacists to advise customers regarding prescriptive drugs. Brushwood & Simonsmeier, *Drug Information for Patients,* 7 J. Legal Med. 279, 302 (1986); Duckworth, *The Potential Liability of Pharmacists Arising From Announcements of New Standards and Codes of Practice,* 43 Food Drug Cosm. L.J. 1, 3 (1988). This should not be surprising given the definition of "Practice of pharmacy" as found in RCW 18.64.011(11), which provides:

> "Practice of pharmacy" includes the practice of and *responsibility for*: Interpreting prescription orders; the compounding, dispensing, labeling, administering, and distributing of drugs and devices; the *monitoring* of drug therapy and use; . . . *the providing of information* on legend drugs which may include, but is not limited to, the *advising* of therapeutic values, hazards, and the uses of drugs and devices.

(Italics mine.) The use of the phrase "and responsibility for" indicates this definition is more than merely descriptive, but also speaks to affirmative duties required of a pharmacist.

RCW 18.64.005(11)[11] empowers the Washington State Board of Pharmacy to

> Promulgate rules for the dispensing, distribution, wholesaling, and manufacturing of drugs and devices and the practice of pharmacy for the *protection and promotion of the public health, safety, and welfare.* Violation of any such rules shall constitute grounds for refusal, suspension, or revocation of licenses or any other authority to practice issued by the board[.]

(Italics mine.)

The regulations adopted by the board are consistent with recognition of RCW 18.64.011(11) as imposing a duty to advise on the pharmacist.

SUMMARY JUDGMENT SHOULD HAVE BEEN DENIED

The issue is, analyzing all the evidence in the light most favorable to the nonmoving party, is there a genuine issue of material fact for the jury to resolve? *Hartley v. State,* 103 Wn.2d 768, 774, 698 P.2d 77 (1985). McKee offered sufficient evidence in response to the defendants' motion to create an issue of fact, precluding summary judgment.

Depositions in the case were filed and published in connection with the summary judgment motion. According to the deposition of Mezistrano, one of the respondent pharmacists, Plegine is distributed in bottles of 100 tablets, with a warning attached to the bottle. The warning was based on the *Physicians' Desk Reference* (hereafter PDR) entry for Plegine. Clerk's Papers, at 749, 756. The PDR and the attached label both stated the warnings quoted above. Clerk's Papers, at 115.

Mezistrano testified that he filled McKee's prescriptions for Plegine on numerous occasions between 1981 and 1984. Clerk's Papers, at 765–73. Mezistrano believed it is important for a pharmacist to determine whether a drug he dispenses is potentially addictive, but that at the time he dispensed Plegine to McKee, he did not believe that Plegine had such a potential. Clerk's Papers, at 691–93.

---

[11]In 1989 RCW 18.64.005(11) was amended. There were no textual changes, but that statute now appears as RCW 18.64.005(7).

Mezistrano also testified that, to fill a prescription for 100 tablets of Plegine, such as that submitted by McKee, he dispensed the drug in the manufacturer's bottles of 100. While he did not rebottle the medicine, he removed the warnings attached to the bottles by the manufacturer because he thought consumers might misunderstand the information and be frightened by it. Clerk's Papers, at 755, 756, 757–58, 777–78.

Gerald Sidran, the other respondent pharmacist, testified that he filled McKee's prescriptions for Plegine on numerous occasions between 1977 and 1981, when he sold the pharmacy to Mezistrano. Clerk's Papers, at 563–68. He testified that he was aware that McKee had been receiving Plegine for an extended period of time. Clerk's Papers, at 591. He maintained that it is common practice for a pharmacy to fill repeated prescriptions for drugs which the literature recommends should not be taken over a long period of time. Clerk's Papers, at 588–89. This, of course, would be no justification, since the standard of due care under RCW 7.70.040 is reasonable prudence, *not customary practice. Harris v. Groth,* 99 Wn.2d 438, 444–45, 663 P.2d 113 (1983).

During the period from 1974 to 1984, McKee never weighed more than 138 pounds. She is 5 feet 4 inches tall. Her weight during the 1982–1983 period dropped at one point to 105 pounds. Clerk's Papers, at 292–93, 331–32.

McKee submitted an affidavit of an expert, Dr. Andrew Weil, who was sharply critical of the defendants' conduct, which was included with her response to defendants' motion for summary judgment. Clerk's Papers, at 117–18. Attached to that affidavit was the Curriculum Vitae of Dr. Weil, which shows that Dr. Weil is currently licensed to practice medicine in seven states: Arizona, California, Maryland, Massachusetts, New York, Oregon and Virginia. Dr. Weil states in his affidavit that during his tenure as professor at the University of Arizona, where he has taught for 10 years, he has lectured on the subject of drug abuse at the pharmacy school of the University of Arizona and has lectured to organizations of professional pharmacists

regarding the duties and responsibilities of pharmacists to their customers. Additionally, Dr. Weil's affidavit demonstrates that he has written several books on the subject of drug abuse which have received national attention and distribution.

Dr. Weil unequivocally states that he is familiar with the duties and standards of care relative to the duties of pharmacists to their customers during the period involved in this case:

> 3. . . . I have lectured to organizations of professional pharmacists. The courses which I have taught deal with the duties and responsibilities of pharmacists to their customers and *I am familiar with such duties and the standards of care relative to the duties of pharmacists to their customers during the period involved in this case.*

(Italics mine.) Clerk's Papers, at 116. Affidavit of Dr. Weil.

Defendants claim the affidavit of Dr. Weil fails to qualify him as an expert capable of rendering an opinion in the present case. For example, they place significance on the fact Dr. Weil was not licensed to practice medicine in the state of Washington nor was he a pharmacist, but the majority cites no authority which would show that an expert has to be licensed in his particular field in Washington in order to qualify as an expert. To the contrary, an expert, if otherwise qualified, need not be licensed to practice his profession in the state of Washington in order to qualify as an expert witness. *Walker v. Bangs,* 92 Wn.2d 854, 601 P.2d 1279 (1979), involved the qualification of an attorney who was not licensed to practice law in Washington, but who stated in his affidavit that he was a "specialist" in trial work. This court approved the consideration of his testimony on the standard of care applicable to attorneys in Washington. In reversing the lower court's dismissal of the cause for failure to prove negligence, this court held:

> Generally, one who holds himself out as specializing and as possessing greater than ordinary knowledge and skill in a particular field, will be held to the standard of performance of those who hold themselves out as specialists in that area. . . .

. . . Brotsky's personal participation in trials in a federal district court of the Ninth Circuit in litigation concerning similar maritime personal injury cases would seem to meet the necessary experiential requirements for qualification as an expert witness in this case, and the exclusion of his testimony was error.

*Walker,* at 860.

Under *Harris,* the standard of due care is not what the pharmacists' peers would do, but what the public has a right to expect. *Harris,* at 444–45. *Harris* encourages the use of expert testimony for the purpose of aiding the jury in "balancing the costs and benefits of a particular procedure and deciding whether it was reasonably prudent." *Harris,* at 449 n.6. As to this question, the testimony of a physician from this or any other state is entirely relevant and obviously admissible for the purpose of aiding the jury.

Dr. Weil in his affidavit testified:

5. In my opinion the drug plegine which possesses the attributes of an amphetamine should never be prescribed by any physician, or be dispensed by any pharmacist, for a period of more than approximately one month. This drug should never, under any circumstances, be given to any person who is not overweight. In my opinion any pharmacist filling a prescription should be aware of the fact that the drug should not be given for a period of more than one month and should be especially aware that this drug should not be dispensed over a long period of time to anyone and especially to a person who is not overweight.

6. In my opinion it was below the standard of care expected of a reasonable and prudent pharmacist acting under the same or similar circumstances (hereinafter "substandard") for Defendants Mezistrano and Sidran (hereinafter the "pharmacists") to dispense the drug plegine to Elaine McKee for the prolonged periods of time it was dispensed to her, under the circumstances of this case. The prescription and prolonged dispensation of this drug over a period of approximately ten years was grossly substandard and inexcusable. Furthermore, in my opinion, the dispensation of this drug caused very serious long term physical and emotional problems to Elaine McKee and was a cause of two suicide attempts by Ms. McKee. The pharmacists in this case had moral and legal duties to advise the patient of the risks of long term therapy with plegine and to make her aware of the side effects and toxicity of the drug when used over long period[s] of time. Their failure to so

advise Ms. McKee was also substandard and the drug as dispensed, without appropriate warnings and instructions was, in my opinion, dangerous and defective.

6. [7.] In my opinion the pharmacists had a duty to reasonably inform themselves of the dangers of drugs which they dispensed. This duty included a responsibility to become reasonably acquainted with the risks of addiction and long term toxicity of these drugs. Pharmacists also have a duty to inform patients about these risks and to question Physicians about their continued prescriptions of drugs when there is reasonable question about the appropriateness of their prescription and/or the safety of the use of such drugs. In my opinion, the pharmacists in this case failed to reasonably inform themselves of the dangers of the drug plegine and its prolonged use and the risks of addiction and long term toxicity. In my opinion, it was substandard for the pharmacists in this case to fail to advise Elaine McKee of these risks and/or to provide her with the manufacturer's printed warnings relating to plegine.

Clerk's Papers, at 117–18. Affidavit of Dr. Weil.

The drug Plegine is not recommended for persons who are not overweight. In any event, it is not recommended for a period of more than "a few weeks". Those recommendations were clearly stated by the manufacturer on labels which the pharmacists, at least, were aware of. In addition, those recommendations were made in the PDR, the standard reference work for the profession. McKee was obviously not overweight and the pharmacists dispensed Plegine to her for at least 10 years. A jury could have concluded that a reasonably prudent pharmacist would take some action in these circumstances; that he would not dispense drugs which are clearly contraindicated, would warn the consumer that the drug is contraindicated or would specifically discuss the contraindication with the prescribing physician.

The jury could also conclude that the pharmacists violated their statutory duty of due care when they removed the manufacturer's warnings from bottles intended for consumers. Given that the warnings were actually glued onto the consumer–size bottles, the jury could conclude that the warnings were intended for consumers and that a reasonably prudent health care provider, dispensing an obviously

powerful drug, would have passed that warning on to the consumer. The majority's argument that some manufacturers' warnings do not accompany individual, consumer–size units, and that requiring pharmacists to pass on such warnings would be a hardship, is completely irrelevant. In this case the warnings did accompany individual bottles; consequently, it could never establish the precedent the majority fears.

The majority's reasoning on the issue of warnings illustrates perfectly why the standard of care is a question of fact and not of law. The majority argues that warnings on drugs "could disturb even the most sophisticated patient." Majority, at 719 (quoting Curran, *Package Inserts for Patients: Informed Consent in the 1980's,* 305 New Eng. J. Med. 1564, 1565–66 (1981)). In effect the majority accepts Mezistrano's argument that consumers ought to be protected from alarming facts concerning the drugs their physicians have prescribed. I find this sort of paternalism offensive. Is the majority seriously suggesting that a patient has no right to be informed of the dangers of the medication he takes? It may be that the question is a proper one for the Legislature, but the Legislature has determined in RCW 7.70.040 that it is also a question of fact for juries. The warning should be passed on to the consumer if a reasonably prudent health care provider would do so. McKee produced sufficient evidence here to be entitled to a jury's judgment on that issue.

I believe the jury could determine factually that the pharmacist had a duty to warn that this particular drug should be discontinued after several weeks. But for argument sake, assume there was no duty to warn, did the defendants have the right to destroy the warning of the manufacturer? This is a factual issue and the jury might find that the destruction of the manufacturer's warning to the consumer McKee was negligence.

Had the druggist not intervened, the plaintiff would have received the "few weeks" warning and she possibly would have been spared her ordeal. The drug was dispensed

directly from the druggist to the consumer—in a small 100-pill container and he could have placed his own label on the capsule container on the opposite side from the manufacturer's label without disturbing it. By what authority did the druggist prevent the consumer from knowing that the drug should only be taken for a few weeks at a time? The cases cited by the majority are factually incorrect as the physician here did not act as a "learned intermediary" between the manufacturer and the client.

The majority concludes its opinion with the startling concession: "We agree pharmacists should have a duty to be alert for patent errors in a prescription, for example: obvious lethal dosages, inadequacies in the instructions, *known* contraindications, or incompatible prescriptions, and to take corrective measures." (Footnotes omitted.) Majority, at 715.

Isn't knowing that Plegine, an amphetamine, should be prescribed only for several weeks rather than 10 years within the definition of the majority's "obvious lethal dosages, inadequacies in the instructions" or "*known* contraindications"? Aren't there factual issues on these matters which prevent a summary judgment from being granted?

### CONCLUSION

McKee produced evidence from which a jury could conclude that the pharmacists failed to act in a reasonably prudent manner and that they breached their duty of due care under RCW 7.70.040. For 10 years the pharmacists Sidran and Mezistrano removed labels from the Plegine prescription sold to McKee which would have warned her that the medication she was receiving was not necessary and was endangering her health. Not only did they remove the manufacturer's warning, the pharmacists never heeded the warning themselves and never took steps to warn McKee verbally of the drug's possible side effects or the recommendation that the drug should be *discontinued* after several weeks. Their failure was repeated, not over a few weeks or a few months, but for 10 years. Since McKee's

evidence was clearly sufficient to go to the jury on the issue of statutory due care, the trial court erred in granting the pharmacists' motion for summary judgment.

I would reverse and remand for trial.

UTTER and BRACHTENBACH, JJ., and PEARSON, J. Pro Tem., concur with DORE, J.