[No. 67748-9-I.   Division One.   January 28, 2013.]

*In the Matter of the De Facto Parentage and Custody of*
M.J.M.

Russ Fulton, *Respondent*, v. Frank Jonathan Miller et al.,
*Appellants*.

228

*Russ Fulton*, pro se.

*Richard Llewelyn Jones* (of *Richard Llewelyn Jones PS*) and *Kathryn B. Abele*, for appellants.

*Teresa R. Byers* and *David J. Ward* on behalf of Legal Voice, amicus curiae.

*J. Mark Weiss*, *Peter S. Lineberger*, and *H. Michael Finesilver* on behalf of American Academy of Matrimonial Lawyers, amicus curiae.

*Douglas P. Becker* on behalf of Washington State Bar Association Family Law Section, amicus curiae.

¶1 SCHINDLER, J. — The biological parents of M.J.M., Frank Miller and Meghan Cotton, contend the trial court erred in considering the petition of the acknowledged father to establish parentage as a de facto parent, designating Russ Fulton as a de facto father of M.J.M., and entering a parenting plan that allows Fulton visitation rights. Miller and Cotton claim that because the parentage statute, former Uniform Parentage Act (UPA), chapter 26.26 RCW (2002), expressly addressed the remedy available to an acknowledged father, the common law de facto parentage doctrine did not apply. We disagree. The legislature

amended the UPA in 2011.[1] Prior to the amendments to the UPA in 2011, where a biological father challenged the paternity of an acknowledged father, the court could not hold a hearing to consider the best interest of the child. We affirm.

## FACTS

¶2 In early 2007, Meghan Cotton and Russ Fulton were dating. In February, Cotton and Fulton went on a week-long vacation together. Some time after the vacation, Cotton started living with her former boyfriend Frank Miller. In March, Cotton discovered she was pregnant. At first, Cotton told Miller he was the child's father. But shortly thereafter, Cotton told Miller that "according to her doctor and the timing, . . . he couldn't be the father." Cotton then contacted Fulton and told him that she was pregnant and he was the child's father. Cotton moved in with Fulton, and they started living together.

¶3 The child was born on December 21, 2007. On December 24, Cotton and Fulton signed a notarized affidavit of paternity. The affidavit of paternity states that Cotton is the mother and Fulton is the father of the child. The birth certificate also states that Fulton is the father of the child and that the child's last name is Fulton.

¶4 For the first few months, Cotton stayed home to take care of the child. Fulton worked full time but also helped care for the child. After five or six months, Cotton went back to work as an exotic dancer. After Cotton returned to work, she "spent less and less time caring" for the child and Fulton assumed more responsibility for taking care of the child.

¶5 Fulton and Cotton separated in December 2008. Cotton moved out and left the child with Fulton. Fulton continued to provide financial support and care for the

---

[1] Laws of 2011, ch. 283.

child. Fulton filed a petition in superior court to adopt a parenting plan designating him as the primary residential parent and enter an order of child support. In answer to the petition, Cotton asserted that she should be designated the primary residential parent but agreed that as the child's biological father, the court should allow Fulton visitation rights. The court appointed a guardian ad litem (GAL). The GAL filed a report recommending the court adopt a parenting plan designating Fulton as the primary residential parent.

¶6 In January 2009, the court entered a temporary parenting plan designating Fulton as the primary residential parent. The temporary parenting plan allowed Cotton to spend time with the child on weekends. The court scheduled a trial in April on the permanent parenting plan.

¶7 Sometime in early 2009, Cotton and Miller obtained genetic testing. The test established Miller was the biological father of the child. Because Miller "had not decided whether he wanted to be involved in [the child]'s life yet," for several weeks he took no action. Meanwhile, Fulton continued to act as the primary parent and caregiver for the child.

*Paternity Action*

¶8 On April 7, Miller filed a petition to establish parentage based on the results of the genetic testing. Miller sought entry of an order declaring him the father of the child, amending the birth certificate, and changing the surname of the child to Miller. Miller also requested entry of a parenting plan and a child support order. The petition identifies the respondents as Fulton as the acknowledged father and Cotton as the mother. Cotton joined the petition and agreed to the requested relief.[2] The court appointed a GAL to represent the 16-month-old child.

---

[2] The joinder states, in pertinent part:

I, MEGHAN COTTON, join in the petition. I understand that by joining in the petition, a decree or judgment and order may be entered in accordance with the relief requested in the petition.

¶9 Miller and Cotton filed a motion to dismiss Fulton from the paternity action. Miller and Cotton argued the genetic test established Miller was the child's biological father. Miller submitted an affidavit setting forth the chain of custody of the samples used for genetic testing and the results. Fulton stipulated to the genetic test. After the GAL filed a report stating that Fulton met the criteria for designation as a de facto parent of the child, the parties submitted additional briefing.

¶10 The trial court granted the motion to dismiss Fulton from the paternity action. The court ruled that Miller had timely filed the petition and established he was the biological father of the child. Accordingly, the court concluded, "[T]here is no need or justification for the Court to resort to a common law analysis and any determination of a de facto parent."

¶11 On August 20, the court entered a judgment and order on the paternity petition, findings of fact and conclusions of law, and an order dismissing Fulton from the action. The court also entered an agreed temporary parenting plan. The temporary parenting plan adopts a schedule to transition the care of the child from Fulton to Miller. The temporary parenting plan allows M.J.M. to continue to live with Fulton for six months while gradually increasing residential time with Miller. The court imposed restrictions on Cotton's residential time with M.J.M.

> The mother's residential time with the child shall be limited based upon the mother's boyfriend engaging in domestic violence as alleged by the mother under King County Cause 09-2-25480-0 KNT.

The court ruled that "Fulton's time after month 8 is reserved for agreement of the parties or court order. The guardian ad litem recommends that [the child] continue to have regular, consistent, weekly contact with Russ Fulton."

¶12 Fulton filed an appeal of the court's decision in the paternity action.

## De Facto Parentage Action

¶13 On November 9, Fulton filed a "Petition for Establishment of De Facto Parent Status and/or Nonparental Custody." Miller and Cotton filed a motion to dismiss the petition on the grounds that the doctrine of res judicata barred the court from considering de facto parentage. The trial court denied the motion to dismiss the petition on the grounds that " '[t]he issue of de facto parentage is not barred by the doctrine of res judicata as it was not previously litigated in [the paternity action].' "[3]

¶14 Fulton filed a motion to find adequate cause to establish the de facto parentage doctrine and nonparental custody. Fulton also requested entry of a temporary parenting plan to allow him to continue to have contact with M.J.M. On February 26, 2010, a superior court commissioner entered an "Order re Adequate Cause" granting the motion to proceed to trial on the petition to establish de facto parentage, but denied the motion as to "Third Party Custody." The commissioner entered a temporary parenting plan that allowed Fulton to spend residential time with M.J.M. Miller and Cotton filed a motion to revise the commissioner's decision.

¶15 A superior court judge denied the motion to revise the commissioner's decision. The court rejected the argument that the de facto parentage doctrine applies only to same-sex couples. The court also rejected the argument that Fulton was like a stepparent.

> Mr. Fulton was acknowledged as the biological father before the child's birth. After the child's birth, he continued to be part of the family unit consisting of himself as the father, Ms. Cotton as the mother[,] and the child. There was no parental relationship with Mr. Miller and the child at all until the child was

---

[3] (Alterations in original.)

more than a year old, during which time, Mr. Fulton had acted in all ways as the child's de facto parent.

¶16 Miller and Cotton filed a motion for discretionary review of the superior court's order on revision. Miller and Cotton asserted the court erred in permitting Fulton to proceed to trial on his de facto parentage claim, arguing the doctrine of res judicata barred Fulton's de facto parentage claim. A commissioner of this court denied the motion for discretionary review.

¶17 On July 6, 2010, we issued an unpublished opinion in Fulton's appeal in the paternity action. We affirmed the trial court's decision to dismiss Fulton from the paternity action. *In re Parentage of M.J.M.*, noted at 156 Wn. App. 1047, 2010 WL 2670679, at *1, 2010 Wash. App. LEXIS 1411, at *1.

*Trial on De Facto Parent Petition and Permanent Parenting Plan*

¶18 On June 14, 2011, the superior court entered an order consolidating the paternity action and the de facto parentage action "for the purposes of determining one final parenting plan for the child [M.J.M.] who is the subject of both actions."

¶19 Miller and Cotton filed a motion to dismiss the petition to establish de facto parentage as barred by res judicata. Miller and Cotton argued the de facto parentage doctrine applied only to same-sex couples and did not apply where the child had two biological parents. Miller and Cotton also argued that the court in the paternity action ruled on Fulton's de facto parentage claim. The court denied the motion to dismiss.

¶20 Beginning in June, the court conducted a lengthy trial on the petition to establish de facto parentage and the permanent parenting plan. At the conclusion of trial, the court granted the de facto parentage petition.

¶21 After engaging in "a strict statutory inquiry," the court ruled that although the de facto parentage doctrine

applies only in narrow circumstances, the evidence established that "those circumstances are present in this case." The court ruled, in pertinent part:

This case falls within the analysis of [*In re Parentage of L.B.*, 155 Wn.2d 679, 122 P.3d 161 (2005)], not [*In re Parentage of M.F.*, 168 Wn.2d 528, 228 P.3d 1270 (2010)]. Mr. Fulton and Ms. Cotton formed the original family unit when [M.J.M.] was born. They intended Mr. Fulton act as [M.J.M.]'s real and only father from birth. Mr. Fulton also became [M.J.M.]'s actual original legal father at birth by virtue of him and Ms. Cotton signing the paternity acknowledgement. It was their intent that Mr. Fulton act as [M.J.M.]'s legal and biological father. Mr. Fulton was legally vested with all the rights and responsibilities of parenthood by statute. By statute, from birth Mr. Fulton and Ms. Cotton were the only two legal parents [M.J.M.] had. Mr. Fulton did not come to his relationship with [M.J.M.] as a later third party like a stepparent. He was the full original legal parent by statute. There was no physical, emotional, or legal relationship between [M.J.M.] and Mr. Miller at that time. Mr. Miller had established no legal rights regarding [M.J.M.] at that time and did not do so for a year and a half thereafter. While Mr. Fulton was the acknowledged father and that acknowledgment was not contested by Mr. Miller, Mr. Miller had no established legal rights regarding [M.J.M.].

¶22 The court entered findings of fact and conclusions of law addressing each of the five factors that must be considered in determining whether the de facto parentage doctrine applied to Fulton. The court set forth extensive and detailed findings of fact and conclusions of law in a 15-page attachment, "Exhibit A." The findings of fact and conclusions of law address each of the five factors:

FACTOR ONE

. . . .

8. That the mother fostered and consented to the relationship of this child and Mr. Fulton by allowing him to sign the affidavit of paternity and holding this child to be his for 14 months. . . .

9. That the biological father, Frank Miller, consented to the relationship by his behaviors at the time of the birth and afterward. See Exhibit A.[4]

---

[4] The additional findings of fact in Exhibit A state, in pertinent part:

**1. The natural or legal parent consented to and fostered the de facto parent relationship.**

Ms. Cotton, the biological and legal mother of [M.J.M.] clearly consented to and fostered Mr. Fulton acting as [M.J.M.]'s real father. She told Mr. Fulton he was the biological father. She went to live with him when she found out she was pregnant. She consented to Mr. Fulton being named on the birth certificate and acknowledgment as the child's natural father. She allowed [M.J.M.] to take the last name Fulton and held Mr. Fulton out as the biological father. She lived together with Mr. Fulton and [M.J.M.] for [M.J.M.]'s first year until about December of 2008 when they separated. During this time she consented and encouraged Mr. Fulton to support and care for [M.J.M.] as his natural child.

. . . It is unknown whether Ms. Cotton was having sexual relations with both men around the likely time of conception. If she was, she knew she could not be certain who the father was. If she was only having relations with Mr. Miller and in fact had not had relations with Mr. Fulton since early February as she claims, by the time she gave birth she would have known Mr. Fulton could not have been the father. For undisclosed reasons, Ms. Cotton chose not to verify paternity. She instead told Mr. Fulton he was the father and consented and encouraged him being legally designated the natural father. She consented to and encouraged Mr. Fulton raising [M.J.M.] as his own [child]. Even after Ms. Cotton and Mr. Fulton separated in December of 2008 and he filed a paternity action petitioning for primary residential placement, Ms. [Cotton] did not initially deny Mr. Fulton was the child's father or even indicate there was a doubt. Nor did she deny Mr. Fulton should have residential time as the child's parent, although they differed as to the specifics of their residential plans.

. . . .

[E]ven if Mr. Miller's consent was required, he clearly acquiesced to having Mr. Fulton become the legal father and allowed Mr. Fulton to raise [M.J.M.] as his own biological child from birth until April of 2009. During the pregnancy Ms. Cotton told Mr. Miller she was pregnant and initially she claimed he was the father at a time he was having sexual relations with her. While she may have later claimed he was not the father, Mr. Miller knows Ms[.] Cotton very well and would have known her information is not always truthful or reliable. More importantly, once she gave birth to [M.J.M.] on December 21, Mr. Miller would have known that nine months before that he was having sexual relations with Ms. Cotton so that there would be no way to tell he was not the father without a paternity test. . . . He knew that Mr. Fulton was holding himself out as the biological father and raising [M.J.M.] as his own child. Knowing all of this, Mr. Miller made a conscious decision to take no action to clarify whether he was or was not [M.J.M.]'s biological father during the first year of [M.J.M.]'s life. He acquiesced in Ms. Cotton's and Mr. Fulton's decision to just assume Mr. Fulton was the father.

## FACTOR TWO

10. That the child lived with Mr. Fulton and not Mr. Miller for 14 months and that the child continued to live with Mr. Fulton for significant time periods the first three years.[5]

## FACTOR THREE

11. That Mr. Fulton received no financial compensation and that he was acting as the biological father without any expectation of compensation;[6]

## FACTOR FOUR

12. That Mr. Fulton has been a parental role long enough to establish a bonded, dependent relationship that was parental in nature. That the first 14 months was enough time to satisfy the length of time requirement and that

---

[5] The additional findings state, in pertinent part:

**2. The Petitioner lived in the same household as the child[.]**

It is not disputed that Mr. Fulton resided with [M.J.M.] from the time he was born until . . . late February of 2010. . . . At the time Mr. Fulton was dismissed from the [paternity] case on August 20, 2009, the parties entered an agreed temporary order allowing Mr. Fulton to continue to have [M.J.M.] in his residence the majority of the time for six more months, until February 2010 . . . . In February of 2010 a temporary parenting plan entered therein giving Mr. Fulton two days and one night on alternating weeks and one day and one night on the other weeks. These temporary orders are in evidence and accurately set forth the time Mr. Fulton spent with [M.J.M.] as Mr. Fulton exercised his residential time as set forth in those plans which are incorporated herein by reference. In sum, the temporary parenting plans indicate [M.J.M.] did not cease living a majority of the time in the same home as Mr. Fulton until the end of February 2010 when [M.J.M.] was about 27 months old.

[6] The additional findings state, in pertinent part:

**3. The Petitioner assumed the obligations of parenthood without expectation of financial compensation.**

It is not disputed that Mr. Fulton took on all the obligations of being [M.J.M.]'s father without any expectation of any financial compensation. For the first about six months of [M.J.M.]'s life Mr. Fulton worked full time and financially supported [M.J.M.] and Ms. Cotton who was not working. When Ms. Cotton went back to work he continued to work full time and contribute his income to the household to support [M.J.M.] and Ms. Cotton. Mr. Fulton never expected, and never received[,] any financial compensation or any child support from Mr. Miller, even after Mr. Miller was established as the natural father and Mr. Fulton still was caring for [M.J.M.] the majority of the time. Nor is there any evidence Mr. Fulton ever received or expected any substantial child support from Ms. Cotton.

238

Mr. Fulton has acted in a parental role throughout the child's life;[7]

FACTOR FIVE

13. That Mr. Fulton has been in a role as a parent to this child that has been permanent, unequivocal, unambiguous, committed, and responsible. That he has been there his whole life and filed this action to remain in the child's life; that he has been responsible taking care of the child's

---

[7] The additional findings state, in pertinent part:

**4. The Petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship that is parental in nature.**

[M.J.M.] was born on December 21, 2007. At the time of birth Mr. Fulton and Ms. Cotton had Mr. Fulton sign the acknowledgment and Mr. Fulton was placed as the father on [M.J.M.]'s birth certificate. It was their intent to live as a family unit in which Mr. Fulton would act as the natural father for [M.J.M.]. It was not their intent or belief that Mr. Fulton would be acting merely as a boyfriend or in a stepparent relation to [M.J.M.]. [M.J.M.] took Mr. Fulton's last name. The parties held Mr. Fulton out to be [M.J.M.]'s biological father. Mr. Fulton engaged in all the activities any biological father would with his infant [child] and parented on an equal basis with Ms. Cotton. He provided daily care such as feeding, bathing, dressing, and attending medical appointments. He taught his child and provided emotional support. [M.J.M.] needed skull surgery during this time and Mr. Fulton was with him at the hospital throughout the surgery and aftercare. Mr. Fulton participated with Ms. [Cotton] on an equal basis in making decisions regarding [M.J.M.] throughout the first year.
. . . .
According to the GAL, Mr. Fulton is a primary attachment figure for [M.J.M.]. This is true. [M.J.M.] lived with Russ Fulton and Russ Fulton physically cared for him nearly every day as the only father he knew for about the first sixteen months of his life, a critical bonding time. Thereafter, although the parties were involved in protracted litigation and Mr. Miller was declared the biological and legal father, [M.J.M.] continued to live with Mr. Fulton the majority of the time until [M.J.M.] was 27 months old. Although . . . he no longer has a majority of the residential time, Mr. Fulton has continued to parent [M.J.M.] weekly since February 2010 until the present.
The GAL had an opportunity to observe Mr. Fulton with [M.J.M.] and found they had a strong and loving father son bond. Mr. Fulton and his witnesses also credibly testified to that. This is not surprising given Mr. Fulton is the only adult who has been in [M.J.M.]'s life consistently since birth and considering that Mr. Fulton has parented him every single week of his life. That bond has not been broken since while this action has been pending significant weekly overnight visitation has continued. Russ Fulton's involved role in [M.J.M.]'s life during the first 16 months until Mr. Miller filed was sufficiently long to, and did in fact, result in a bonded dependent parental relationship. That relationship and bond remains today.

needs; that he has been committed by taking his visits and continuing in his parental role.[8]

¶23 The court found that it was in the best interest of the child to designate Fulton as a de facto parent.

It is in the best interest of the child that Mr. Fulton be named a De Facto parent and that he be granted all rights and duties afforded him under Common Law and parity in this matter. The parenting plan adopted this date is in [M.J.M.]'s best interest. See Exhibit A incorporated herein by reference.[9]

---

[8] The additional findings of the court state, in pertinent part:

**5. Petitioner's role in the child's life has been permanent, committed, unequivocal, and responsible.**

[Fulton] intended to act as [the child]'s father for life. He has parented [M.J.M.] since birth. He has consistently and responsibly done all the tasks a parent does. . . . He has never failed to provide for [M.J.M.]'s needs and has always actively pursued his role as a loving parent. . . . He does not object to the imposition of a support order that would render him more responsible for [M.J.M.]'s financial support than either biological parent. Mr. Fulton's role has been permanent, committed, unequivocal and responsible.

[9] The additional findings state, in pertinent part:

**6. It is in the best interest of [M.J.M.] to have Russ Fulton declared his de facto parent and to not significantly change [M.J.M.]'s current relationship and contact with Mr. Fulton.**

Given the unique history of this case, cutting off or impairing the lifetime primary bond between [M.J.M.] and Russ Fulton at this time would likely cause emotional or psychological distress or damage to [M.J.M.]. [M.J.M.] lived with and knew only Mr. Fulton and Ms. Cotton as mother and father for about the first year and a half of his life. At about age one his mother left the home leaving [M.J.M.] in Mr. Fulton's primary care. Thereafter her visits dwindled to about one per month and, thereafter, in the six months prior to trial his mother completely severed her bond with [M.J.M.] by having no visits with him. . . . Potential trauma from severing [M.J.M.]'s bond with his de facto parent may be magnified because in these early years he has already suffered the breaking of primary bonds with his mother.

[M.J.M.] is also particularly susceptible to stress from such a traumatic life change because he has undergone an inordinate number of life changes already due to the change in his primary residential placement. . . . In about one year [M.J.M.] stopped living with both the mother and father he had known since birth and had virtually every aspect of his life altered. These changes are not due to courts declaring a de facto parent. They are the result of Mr. Miller waiting until [M.J.M.] was well over a year old to determine his paternity and until [M.J.M.] was 16 months old to file a paternity action.

So much change has been overwhelming for a three year old. It has emotionally impacted and stressed [M.J.M.]. [T]he last thing [M.J.M.] needs is

¶24 The court entered a de facto parentage custody decree, a final parenting plan, and an order of child support. The decree names Fulton as "a father to this child" and gives him visitation as set forth in the parenting plan. The parenting plan designates Miller as the primary residential parent but allows Cotton and Fulton to spend time with M.J.M.[10]

¶25 The parenting plan restricts Cotton's residential time with M.J.M. because she was living with a man who had engaged in a history of domestic violence and her involvement and conduct may have an adverse effect on the child based on "[n]eglect or substantial nonperformance of parenting functions."

¶26 Based on Miller's prior serious felony convictions, the court also imposed conditions designed to address the potential adverse effect on M.J.M. The final parenting plan states, in pertinent part:

Mr. Miller was convicted of assault prior to the birth of this child, the court hereby imposes the following conditions:

- No alcohol or controlled substances while [M.J.M.] is in his care;

- No further criminal activity above a misdemeanor[;]

---

a traumatic change like terminating his bond with the one adult who has parented him since birth, Mr. Fulton.

. . . .

In addition to avoiding emotional trauma and further stressful change, declaring Mr. Fulton to be [M.J.M.]'s de facto parent is in [M.J.M.]'s best interest because he protects and provides for [M.J.M.] in ways his parents do not.

. . . .

Given the history of this case, it would make far more sense to cut off or reduce Ms. Cotton's contact rather than Mr. Fulton's contact. She did not visit [M.J.M.] for months, while Mr. Fulton is the one person who has parented [M.J.M.] throughout his life. While these circumstances are not traditional, and while Mr. Fulton and Mr. Miller did not cho[o]se to raise a son together, the real truth is that in the last two years [M.J.M.] has not been raise[d] by a mother and father, but by his two dads. [M.J.M.] knows this and loves them both. It is in [M.J.M.]'s best interest to have Mr. Fulton declared his de facto parent and to avoid major change in Mr. Fulton's residential time.

[10] The court adopted a phased-in approach to the amount of time Cotton could spend with M.J.M.

- No corporal punishment by any parties in this matter.

¶27 The child support order requires Cotton to pay $154.50 per month and Fulton to pay $339.50 per month in child support to Miller.

¶28 Miller and Cotton appeal. Fulton did not file a response. At our request, Legal Voice and the American Academy of Matrimonial Lawyers submitted briefs as amici curiae.[11]

## ANALYSIS

¶29 Miller and Cotton (collectively Miller) contend the trial court erred in denying the motion to dismiss the petition to establish de facto parentage on the grounds that (1) the doctrine of res judicata barred the petition and (2) the statute, former 2002 UPA, expressly provided a statutory remedy.[12]

### *Res Judicata*

¶30 Miller argues that res judicata barred Fulton from filing an action to establish de facto parentage because the trial court in the paternity action rejected his de facto parentage claim.

¶31 Whether res judicata bars an action is a question of law we review de novo. *Lynn v. Dep't of Labor & Indus.*, 130 Wn. App. 829, 837, 125 P.3d 202 (2005). The doctrine of res judicata precludes filing two separate actions based on the same claim. *Ensley v. Pitcher*, 152 Wn. App. 891, 898-99, 222 P.3d 99 (2009). Res judicata bars

---

[11] The amici curiae briefing was helpful to our analysis of this important issue.

[12] Miller also contends the court erred in entering the parenting plan absent a finding of adequate cause. But Miller does not cite authority in support of his assertion that a party must "meet the adequate cause threshold to modify any existing parenting plan in place concerning the child [for] whom they are seeking de facto parent status." RAP 10.3(a)(6); *McKee v. Am. Home Prods. Corp.*, 113 Wn.2d 701, 705, 782 P.2d 1045 (1989) ("We will not consider issues on appeal that . . . are not supported by argument and citation to authority.").

litigation of a claim that either was or should have been litigated in a former action. *Loveridge v. Fred Meyer, Inc.*, 125 Wn.2d 759, 763, 887 P.2d 898 (1995). The threshold requirement for the doctrine of res judicata is a final judgment on the merits of the prior action. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 865, 93 P.3d 108 (2004).

¶32 Here, Miller relies on the trial court's oral ruling in the paternity action to argue res judicata barred Fulton's de facto parentage action. But the court's oral ruling in the paternity action is not a final judgment on the merits of Fulton's de facto parentage claim.[13] The court in the paternity action ruled, in pertinent part:

> [I]f the legislature has addressed the situation that is now before the Court, there is no need or justification for the Court to resort to a common law analysis and any determination of a de facto parent.

Consequently, in the first appeal, we refused to consider the common law de facto parentage doctrine because "Fulton did not properly raise this issue before the trial court and the trial court did not formally rule upon it. Accordingly, it is not properly before us. We decline to address it." *M.J.M.*, 2010 WL 2670679, at *4, 2010 Wash. App. LEXIS 1411, at *15.

¶33 We hold that the doctrine of res judicata did not bar Fulton's de facto parentage action.

## De Facto Parentage Doctrine

¶34 Our Supreme Court first recognized the common law de facto parentage doctrine in *L.B.* In *L.B.*, the court addressed whether the former same-sex partner of the biological mother had standing to file a petition to establish parentage as a de facto parent. *L.B.*, 155 Wn.2d at 682-83.

---

[13] Further, an oral ruling "has no final or binding effect, unless formally incorporated into the findings, conclusions, and judgment." *Ferree v. Doric Co.*, 62 Wn.2d 561, 567, 383 P.2d 900 (1963).

The couple in *L.B.* decided to use artificial insemination and were in a committed relationship. *L.B.*, 155 Wn.2d at 683-84. After L.B. was born, the women co-parented the child, and the couple held themselves out as a family. *L.B.*, 155 Wn.2d at 684. When the child was five years old, the biological mother terminated all contact between her former partner and L.B. *L.B.*, 155 Wn.2d at 684-85.

■■ ¶35 The Supreme Court held that in the absence of a statutory remedy under the UPA, the same-sex partner had standing to file a petition for a determination of parentage under the equitable common law de facto parentage doctrine. *L.B.*, 155 Wn.2d at 683.

> [S]imply because a statute fails to speak to a specific situation should not, and does not in our common law system, operate to preclude the availability of potential redress. This is especially true when the rights and interests of those least able to speak for themselves are concerned. . . .
>
> Reason and common sense support recognizing the existence of *de facto* parents and according them the rights and responsibilities which attach to parents in this state. We adapt our common law today to fill the interstices that our current legislative enactment fails to cover in a manner consistent with our laws and stated legislative policy.

*L.B.*, 155 Wn.2d at 707.

¶36 The court adopted the following criteria to establish de facto parentage:

> "(1) the natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature."

*L.B.*, 155 Wn.2d at 708 (quoting *In re Parentage of L.B.*, 121 Wn. App. 460, 487, 89 P.3d 271 (2004)). In addition, the court states that recognition of a de facto parent is " 'lim-

ited' " to an adult who has " 'fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life.' " *L.B.*, 155 Wn.2d at 708 (quoting *C.E.W. v. D.E.W.*, 2004 ME 43, ¶ 14, 845 A.2d 1146, 1152).

¶37 The court held that a de facto parent stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise; and as such, recognition of a person as a child's de facto parent necessarily " 'authorizes [a] court to consider an award of parental rights and responsibilities . . . based on its determination of the best interest of the child.' " *L.B.*, 155 Wn.2d at 708[14] (quoting *C.E.W.*, 2004 ME 43, at ¶ 15, 845 A.2d at 1152).

¶38 In *M.F.*, the Supreme Court addressed whether the doctrine of de facto parentage applied to a stepparent. *M.F.*, 168 Wn.2d at 529. The court emphasized the need to first address the threshold determination of whether there is a lack of a statutory remedy before considering the factors set forth in *L.B.*. *M.F.*, 168 Wn.2d at 534.

> In *L.B.*, we set forth a multifactor test by which de facto parentage may be established. . . . [H]owever, the correct starting point is not whether the de facto parent test has been met. The factors outlined in *L.B.* are relevant only if this court first decides that the de facto parentage doctrine applies to the circumstances presented in this case.
>
> . . . [W]e adopted the de facto parentage doctrine to correct a specific statutory shortcoming: the lack of remedy available to the respondent in *L.B.*, who was a "parent" in every way but legally.

*M.F.*, 168 Wn.2d at 533-34.

¶39 Because the legislature "created and refined a statutory scheme by which a stepparent may obtain custody of a stepchild," the court in *M.F.* held the common law de facto doctrine did not apply. *M.F.*, 168 Wn.2d at 532, 535. The

---

[14] (Alterations in original.)

court also pointed out the difference between the relationship in *L.B.* and the status of a stepfather:

> [U]nlike in *L.B.*, [the] status [of M.F.'s biological parents] as legal parents was established at the outset. In contrast, Corbin entered M.F.'s life as a stepparent, a third party to M.F.'s two existing parents. When Corbin entered her life, M.F.'s legal parents and their respective roles were already established under our statutory scheme.

*M.F.*, 168 Wn.2d at 532. Because "no statutory void exist[ed] in [*M.F.*], as it did in *L.B.*," the court "decline[d] to extend the de facto parentage doctrine to the facts presented." *M.F.*, 168 Wn.2d at 535.

*Statutory Remedy*

■ ¶40 The dispositive question in this case is whether Fulton had a statutory remedy under former 2002 UPA to seek to preserve his parental relationship with the child. Miller contends that as in *M.F.*, the UPA unequivocally addresses the parental rights of an acknowledged father under former RCW 26.26.540 (2002)[15] and former RCW 26.26.600 (2002).[16] Contrary to Miller's contention, we conclude that while the former UPA required the court to consider a number of factors in determining whether allowing genetic testing was in the best interest of the child, the plain language of the statute did not provide the same remedy to an acknowledged father such as Fulton.

¶41 We review questions of law and the meaning of a statute de novo. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003); *Lake v. Woodcreek*

---

[15] In 2011, the legislature amended the statute, extending the period to commence a proceeding from two years to four years, and requiring that the child be made a party to proceedings commenced more than two years after the child's birth. Laws of 2011, ch. 283, § 34.

[16] The legislature amended RCW 26.26.600 in 2011 to add gender-neutral language to subsection (1) and added subsection (5). Laws of 2011, ch. 283, § 42.

*Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010).[17]

¶42 When interpreting a statute, the court's primary goal is "to ascertain and give effect to legislative intent." *State v. Pac. Health Ctr., Inc.*, 135 Wn. App. 149, 158-59, 143 P.3d 618 (2006). Legislative intent is determined primarily from the statutory language, viewed "in the context of the overall legislative scheme." *Subcontractors & Suppliers Collection Servs. v. McConnachie*, 106 Wn. App. 738, 741, 24 P.3d 1112 (2001). If the statute's meaning is plain on its face, we give effect to that plain meaning. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).

¶43 In 1976, Washington adopted the model UPA drafted by the National Conference of Commissioners on Uniform State Law (NCCUSL). *See* LAWS OF 1975-76, 2d Ex. Sess., ch. 42. In April 2002, the Washington State Legislature repealed and replaced the UPA with the model draft UPA of 2000. *See* LAWS OF 2002, ch. 302, § 711; 2002 FINAL LEGISLATIVE REPORT, 57th Wash. Leg., at 43-45. The UPA "governs every determination of parentage." Former RCW 26.26.021(1) (2002).[18] Former 2002 UPA defines a "parent" as an individual who has a legal relationship with a child. Former RCW 26.26.011(12), (13) (2002).[19] Under the UPA, a father-child relationship is established by "[t]he man's having signed an acknowledgement of paternity under RCW 26.26.300 through 26.26.375, unless the acknowledgment has been rescinded or successfully challenged," or by "[a]n adjudication of the man's paternity." Former RCW

---

[17] Because Miller does not challenge the trial court's findings of fact, the findings of fact are verities on appeal. *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

[18] The legislature amended RCW 26.26.021(1) in 2011 to replace "governs every" with "applies to." LAWS OF 2011, ch. 283, § 2. The 2011 statute states, "This chapter *applies to* determinations of parentage in this state." RCW 26.26.021(1) (emphasis added).

[19] In 2011, the legislature amended RCW 26.26.011 and renumbered the subsections. LAWS OF 2011, ch. 283, § 1.

26.26.101(2)(b), (c) (2002).[20] An acknowledgement of paternity "is equivalent to an adjudication of paternity of a child and confers upon the acknowledged father all the rights and duties of a parent." Former RCW 26.26.320(1) (2002).[21]

¶44 Under former RCW 26.26.540(2), Miller could seek an adjudication of the child's paternity within two years of the effective date of the acknowledgement. Former RCW 26.26.540(2) states:

> If a child has an acknowledged father or an adjudicated father, an individual, other than the child, who is neither a signatory to the acknowledgment nor a party to the adjudication and who seeks an adjudication of paternity of the child must commence a proceeding not later than two years after the effective date of the acknowledgment or adjudication.[22]

¶45 Under former RCW 26.26.600(1),

> [t]he paternity of a child having a presumed, acknowledged, or adjudicated father may be disproved only by admissible results of genetic testing excluding that man as the father of the child or identifying another man to be the father of the child.

---

[20] The legislature amended RCW 26.26.101 in 2011 to add gender-neutral language and include additional bases for the parent-child relationship. LAWS OF 2011, ch. 283, § 5.

[21] The legislature amended RCW 26.26.320(1) in 2011 to replace the word "paternity" with "parentage." LAWS OF 2011, ch. 283, § 15.

[22] As amended, RCW 26.26.540 now provides:

**Proceeding to adjudicate parentage—Time limitation: Child having acknowledged father or adjudicated parent.** (1) If a child has an acknowledged father, a signatory to the acknowledgment or denial of paternity must commence any proceeding seeking to rescind the acknowledgment or denial or challenge the paternity of the child only within the time allowed under RCW 26.26.330 or 26.26.335.

(2) If a child has an acknowledged father or an adjudicated parent, an individual, other than the child, who is neither a signatory to the acknowledgment nor a party to the adjudication and who seeks an adjudication of parentage of the child must commence a proceeding not later than four years after the effective date of the acknowledgment or adjudication. If an action is commenced more than two years after the birth of the child, the child must be made a party to the action.

(3) A proceeding under this section is subject to RCW 26.26.535.

¶46 RCW 26.26.405 requires the court to order genetic testing "[e]xcept as otherwise provided in this section and RCW 26.26.410 through 26.26.630." RCW 26.26.405(1).[23] Under RCW 26.26.600, where the result of genetic testing is properly admitted, the man identified as the biological father must be adjudicated as the father of the child and the "man excluded as the father of a child by genetic testing must be adjudicated not to be the father." RCW 26.26.600(2), (4).[24]

¶47 Where there was a challenge to the paternity of a presumed father, former RCW 26.26.535 (2002)[25] required the court to hold an evidentiary hearing to determine whether genetic testing was in the best interests of the child. *In re Parentage of S.E.C.*, 154 Wn. App. 111, 112, 225 P.3d 327 (2010) (Where there is a presumptive father, the trial court must first hold a hearing and consider statutory factors to determine whether genetic testing is in the best interest of the child.).

¶48 Former RCW 26.26.535 sets forth the factors the court must take into consideration in making this determination. The plain and unambiguous language of former RCW 26.26.535 makes clear that the statute applies only to a presumed father and does not apply to an acknowledged or adjudicated father. *In re Parentage of K.R.P.*, 160 Wn. App. 215, 225-26, 247 P.3d 491 (2011). Former RCW 26.26.535 provides:

(1) In a proceeding to adjudicate parentage under circumstances described in RCW 26.26.530, a court may deny genetic

---

[23] We note the legislature amended RCW 26.26.405 in 2011 to add gender-neutral language to subsections (2) and (4), and added subsection (5). LAWS OF 2011, ch. 283, § 22. However, the amendments did not affect subsections (1) and (3) of the statute.

[24] The 2011 amendments to RCW 26.26.600 did not affect subsections (2) and (4). *See* LAWS OF 2011, ch. 283, § 42.

[25] The legislature amended RCW 26.26.535 in 2011, clarifying and expanding the rights and obligations of state registered domestic partners and other couples related to parentage. LAWS OF 2011, ch. 283, § 33.

testing of the mother, the child, and the presumed father[26] if the court determines that:

(a) The conduct of the mother or the presumed father estops that party from denying parentage; and

(b) It would be inequitable to disprove the father-child relationship between the child and the presumed father.

(2) In determining whether to deny genetic testing under this section, the court shall consider the best interest of the child, including the following factors:

(a) The length of time between the proceeding to adjudicate parentage and the time that the presumed father was placed on notice that he might not be the genetic father;

(b) The length of time during which the presumed father has assumed the role of father of the child;

(c) The facts surrounding the presumed father's discovery of his possible nonpaternity;

(d) The nature of the father-child relationship;

(e) The age of the child;

(f) The harm to the child which may result if presumed paternity is successfully disproved;

(g) The relationship of the child to any alleged father;

(h) The extent to which the passage of time reduces the chances of establishing the paternity of another man and a child support obligation in favor of the child; and

(i) Other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the presumed father or the chance of other harm to the child.

(3) In a proceeding involving the application of this section, the child must be represented by a guardian ad litem.

(4) A denial of genetic testing must be based on clear and convincing evidence.

---

[26] A "presumed father" is defined as a man married to a mother when the child is born. Former RCW 26.26.116(1)(a) (2002) (The legislature amended RCW 26.26.116 in 2011, clarifying and expanding the rights and obligations of state registered domestic partners and other couples related to parentage. Laws of 2011, ch. 283, § 8.).

(5) If the court denies genetic testing, it shall issue an order adjudicating the presumed father to be the father of the child.

¶49 In November 2002, NCCUSL amended the model UPA to address the disparate treatment of presumed, acknowledged, and adjudicated fathers, and included an amendment that gave the court discretion to not allow genetic testing if an acknowledged father showed it was not in the best interest of the child.[27] The NCCUSL comment states, in pertinent part:

This section incorporates the doctrine of paternity by estoppel, which extends equally to a child with a presumed father or an acknowledged father. In appropriate circumstances, the court may deny genetic testing and find the presumed or acknowledged father to be the father of the child. The most common situation in which estoppel should be applied arises when a man knows that a child is not, or may not be, his genetic child, but the man has affirmatively accepted his role as child's father and both the mother and the child have relied on that acceptance. Similarly, the man may have relied on the mother's acceptance of him as the child's father and the mother is then estopped to deny the man's presumed parentage.

. . . .

Because § 607 places a two-year limitation on challenging the presumption of parentage, the application of this section should be applied in those meritorious cases in which the best

---

[27] The NCCUSL prefatory note states, in pertinent part:

The amendments of 2002 are the end-result of objections lodged by the American Bar Association [(ABA)] Section of Individual Rights and Responsibilities and the ABA Committee on the Unmet Legal Needs of Children, based on the view that in certain respects the 2000 version did not adequately treat a child of unmarried parents equally with a child of married parents. Because equal treatment of nonmarital children was a hallmark of the 1973 Act, the objections caused the drafters of the 2000 version to reconsider certain sections of the Act.

UNIF. PARENTAGE ACT (2000) prefatory note (amended 2002), 9B U.L.A. 6 (Supp. 2011); *see also In re Parentage of J.M.K.*, 155 Wn.2d 374, 377 n.1, 119 P.3d 840 (2005) ("After Washington state adopted the UPA of 2000, the Commissioners revised that version of the UPA in 2002 in part because it treated children of an unmarried couple differently than those of a married couple.").

interest of the child compels the result and the conduct of the mother and presumed or acknowledged father is clear.

UNIF. PARENTAGE ACT (2000) § 608 cmt. (amended 2002), 9B U.L.A. 54 (Supp. 2011).[28]

¶50 Effective July 2011, the Washington State Legislature amended the UPA to incorporate the NCCUSL 2002 model UPA. *See* LAWS OF 2011, ch. 283. As amended, RCW 26.26.535 authorizes a court to deny genetic testing to disprove the paternity of an acknowledged father. RCW 26.26.535 now provides, in pertinent part:

**Proceeding to adjudicate parentage—Authority to deny genetic testing.** (1) In a proceeding to adjudicate parentage under circumstances described in RCW 26.26.530 or in RCW 26.26.540, a court may deny a motion seeking an order for genetic testing of the mother or father, the child, and the presumed or acknowledged father if the court determines that:

(a)(i) The conduct of the mother or father or the presumed or acknowledged parent estops that party from denying parentage; and

(ii) It would be inequitable to disprove the parent-child relationship between the child and the presumed or acknowledged parent; or

(b) The child was conceived through assisted reproduction.

(2) In determining whether to deny a motion to seek an order for genetic testing under subsection (1)(a) of this section, the court shall consider the best interest of the child, including the following factors:

(a) The length of time between the proceeding to adjudicate parentage and the time that the presumed or acknowledged

---

[28] Likewise, in addressing the section that corresponds to RCW 26.26.540, NCCUSL states:

The 2002 amendment adding subsection (c) authorizes the court to deny genetic testing in accordance with the principles enumerated in § 608 in a fact situation in which equity justifies a denial. For example, if there is an untimely challenge by a third party to the paternity of an acknowledged or adjudicated father long after an actual father-child relationship has been formed, the court has discretion to refuse to order genetic testing.

UNIF. PARENTAGE ACT (2000) § 609 cmt. (amended 2002), 9B U.L.A. 56 (Supp. 2011).

parent was placed on notice that he or she might not be the genetic parent;

(b) The length of time during which the presumed or acknowledged parent has assumed the role of parent of the child;

(c) The facts surrounding the presumed or acknowledged parent's discovery of his or her possible nonparentage;

(d) The nature of the relationship between the child and the presumed or acknowledged parent;

(e) The age of the child;

(f) The harm that may result to the child if parentage is successfully disproved;

(g) The nature of the relationship between the child and any alleged parent;

(h) The extent to which the passage of time reduces the chances of establishing the parentage of another person and a child support obligation in favor of the child; and

(i) Other factors that may affect the equities arising from the disruption of the parent-child relationship between the child and the presumed or acknowledged parent or the chance of other harm to the child.

¶51 The legislative history and the statutory language of the UPA makes clear that prior to July 2011, the court could not consider whether the admission of genetic testing was in the best interest of the child where there was a challenge to the paternity of an acknowledged father. We conclude the court did not err in considering Fulton's petition to establish de facto parentage and affirm.[29]

BECKER and COX, JJ., concur.

---

[29] The unchallenged findings of fact establish application of the de facto parentage doctrine and support the court's conclusion that Fulton was the de facto father of M.J.M. and it was in the best interest of the child to continue to have a relationship with Fulton.